Good morning, Your Honors. Good morning. My name is Rich Kirtner. I'm the Federal Defender for Alaska, and I represent Robert Lincoln. Nice to see you again this morning, Mr. Kirtner. Thank you, Your Honor. It's good to be here and away from some snow. Your Honor, in this case, obviously there are a number of Fourth and Fifth Amendment issues that we have briefed in this case. And in reviewing this case for argument today, it struck me that if the Fourth and the Fifth Amendments draw some boundaries between citizen and law enforcement, in this particular case, as an example, where Anchorage police officers stepped over one boundary after another after another with Mr. Lincoln, from the initial confrontation to his seizure without reasonable suspicion, to the frisk, to going through his pockets and pulling out this small canister, to asking him questions without Miranda, to searching his truck without a warrant based on that arrest, and then from other statements from Mr. Lincoln after he had already, in the cruiser when he had invoked his right to remain silent. Mr. Kirtner, are you challenging the probable cause to arrest him based solely on the fact that upon arrival at the domestic disturbance call, the officers discovered him engaged in a misdemeanor act of, I guess it would be malicious mischief by letting the air out of his girlfriend's tires? Well, he wasn't arrested for that, and it was actually his vehicle. And I think as he explained to the officers, and this was verified, that he was letting the air out of the tires so his girlfriend could not drive his vehicle. I understand his explanation, but didn't the magistrate judge make a specific finding that they did at that point have probable cause to arrest him for that misdemeanor committed in their presence? I don't think so, Your Honor. I have to – I think that – I read that in Judge Roberts. I think that it was – I think it was part of the reasonable suspicion that it could have been some kind of a city or state misdemeanor in malice. But, you know, there was no investigation that, in fact, Mr. Lincoln had made an explanation to the police that it was his vehicle and it's not a crime in his driveway of his vehicle to let the air out of the tires. That would be true. But, of course, the question is, at least with regard to a Terry-type stop for reasonable suspicion, at that point the police don't have to accept his statement to that effect, and they clearly did catch him in the act of letting the air out of the tires. Yes, but I think what's important in this particular case to look at – and this, I think, is a classic Terry stop type of confrontation. And one of the things I may disagree in the government's brief as far as what information the officers had. When reviewing the information that was provided from the 9-11 dispatcher to the police officers, they knew three things about Mr. Lincoln, that he had had an argument with his girlfriend, that he was left in a blue Chevy pickup truck, and that he was, quote, a drug dealer. That's the information they had from dispatch. And what they didn't have was that this argument was assault in any way, that there were any weapons involved. In fact, the dispatcher had asked Ms. Plentikoff if there were any weapons, and she answered no, and that she was a reliable informant. They knew nothing about her. So with that information in the police officer's mind, it's our position that for them to stop Mr. Lincoln in his own driveway and to immediately conduct a Terry-type seizure and pat-down search is beyond Terry. Why? Pardon me? Why? Because they didn't have a reasonable suspicion that he was involved in criminal activity. When they saw him with just this information, that his girlfriend called and said he was a drug dealer, that that's not enough for a reasonable suspicion in a reasonable officer's mind that he was involved in criminal activity when he stopped. And beyond that, they didn't have any reason to believe he was armed and dangerous in order to conduct a pat-down search. And I think it's important to know that this happened almost immediately on the confrontation when they approached him, that they not only ordered him to come to the officer and did a pat-down search. They actually had his hands behind his back. They held his thumbs. It's analogous to being handcuffed, although it was a thumb cuff. The officer had his thumb. But the cases in the Supreme Court cases have recognized that for officers' safety, the mere handcuffing, I mean, this is a contact at 1 a.m. in the morning. The officers are responding essentially to an unknown trouble call arising out of a domestic disturbance dispute. And the case law pretty clearly says there's a difference between a brief detention, where a person is physically restrained for officer safety reasons, and an arrest, is there not? Yes, there is. But I think this went beyond – I mean, we don't suggest in our briefs that there was any problem with the officers approaching Mr. Lincoln and asking him questions. Suppose that Mr. Lincoln had been in the process of shattering the glass of the windows of the car on arrival, which is not uncommon in domestic violence cases. We've got another case on the calendar from a Washington county where that's what the sheriff's deputies found on arrival. How's that different from letting the air out of the tires? Wouldn't you agree that in the glass-shattering case, the officers would certainly have reasonable suspicion to conduct a terror attack? Well, I think that would give – I think it would be more reasonable. I think the fact that in this particular case, letting the air out of the tires, and the information the officers had when they asked him about that, he explained that it was his vehicle and he gave an explanation that was not criminal activity and there was nothing to sort of enhance their reasonable suspicion. It negated it. And the fact that, you know, Mr. Lincoln was not trying to flee. He was not trying to – you know, there was no furtive movements. There was nothing to suggest that, you know, there was any kind of criminal activity going on. Why don't you move on? Let's just assume for the sake of argument that they were at least appropriately conducting a Terry-type field contact. Let's move on to the pat-down search and the 35-millimeter film. And then I think that that pat-down search violates Minnesota v. Dickerson, for example, where the fact that if they are – and if the officers did have a reason to pat down for a weapon, like the weapon that they found on Terry, this is a small plastic canister that the officers pulled out. And I think it's obvious from the record that they were looking for drugs at that point, that this was not a weapon. And, in fact, that they – It could have held a hypodermic needle, couldn't it? A hypodermic needle or a small razor blade? You know, I don't think it's even reasonable to assume – You're not aware of any cases where officers have been pricked by hypodermic needles when they're searching drug addicts? Yeah. I have not found any cases where there's anything of danger in a small plastic 35-millimeter film canister. I just – Well, I have a few at home myself. However, it is just a single film canister. So – and I think the officer's explanation was it could have been explosives. And I think that that goes beyond the reasonableness that's required here. So I just – and I think these are – I think this initial confrontation and the – Is there anything wrong with the officer when he finds the canister saying, you know, what's in it? Well, I think, yes, because he's going beyond a Terry search. He's going beyond looking for weapons. Well, if the motivation for the question is to satisfy the officer that there's nothing in there that might potentially pose a danger to him, is there anything wrong under the case law with asking him? Is there some noxious object in there that I need to be worried about? I can't recall a case that holds that. The cases seem to recognize that the officers, assuming that we don't find that he was in custody, that the officers are permitted to ask sort of general on-the-scene questioning, particularly if they're related to officer safety. Do you have any knives or weapons on you, anything that might hurt me? Well, and I think that they did ask that question, and that's when he indicated it was his girlfriend's stash, and that's when they proceeded to open a canister and go – So if the question is appropriate and the answer is an admission, now reasonable suspicion has morphed to probable cause? Probable cause to arrest? For the possession of narcotics, if he says, my girlfriend's stash should suggest to a reasonable police officer that there may be contraband inside the canister. But I think that those statements were generated when he was in custody because – Okay. So you agree we would have to find he was in custody at that point? Yes. Yes. All right. You want to – oh, go ahead. If he was in custody and they asked him what's inside and he gives an incriminating answer, there's cocaine in his stash or whatever, and they open it and find the drugs, would Patan mean that despite the Miranda violation, the government could still introduce the drugs, couldn't they, the Supreme Court decision in Patan? Yes. Yes. I agree that that's what the holding of Patan. So you're – most of the – in order to overcome most of the prejudicial evidence and show that it shouldn't have been admitted, you really do need an improper search to start with, don't you?  Yes, that's true. That's procedure. That's correct, because I think that the search of the vehicle, the search of the pocket, the search of the canister, and the search of the vehicle, all are fruits of the illegal stop and seizure and frisk of Mr. Lincoln. Thank you very much, Mr. Governor. That's very good. Thank you, Your Honors. Joanne Farrington again for the United States in this case. Thinking about – this case is practically a textbook law school exam. In the course of five minutes, the defendant has managed to identify innumerable issues, but I think that they can be boiled down to three. The – and if those three questions can all be answered as the district court did, then the defendant's conviction can be upheld because all of the evidence against him was lawfully admissible. The first question is whether or not the initial approach to the defendant, to ask him what he was doing in the middle of the night, crouched down by the side of the van outside a house where there had been a domestic disturbance call, was appropriate. And I think the answer to that question is unquestionably yes. The Supreme Court and this Court has numerous times made it clear that the police can approach a citizen and ask them questions. A citizen does not have to answer that question at that point in time. But as long as there's no coercion, the questions can be asked by a police officer of a citizen. And that is basically all that happened here until events developed a little bit further. The next question is whether or not the ---- Did the Terry encounter become something else? Was there – when the police put – held his thumbs and put his arms behind his back, did that blossom into custody in your view? No. I don't believe that he was in custody at that point. Why not? Because first he had consented to the pat-down. This was simply a routine police safety pat-down. Is consent to a pat-down the same as consent to being restrained? He was not restrained. The officer was holding his thumbs together so that he could feel if he would lunge away or push against him. And he put his legs between – he put his leg between the defendant's legs so that he could have – In the normal pat-down stance. That's correct. He turned the defendant away from him and stood with it, holding his two thumbs. There's actually a fairly complete testimony as to exactly what he was doing and why by the officer. The test for custody is whether a reasonable person would feel free to leave. Would you agree that that's the test for whether someone is in custody? Well, no. The test for custody is not that in the context of a pat-down search. I don't think that anyone who is being patted down for police safety thinks that he can then just turn around and walk away, particularly once he's consented to the pat-down search. What case are you relying upon to support your assertion that it's customary in a police pat-down to – to restrain the person being the subject of the pat-down? What case are you relying upon for that? I'm not relying on a case. I'm relying on the officer's testimony as to the way he conducts himself. Right. But I'm just saying under the law, what amount of restraint is allowable in a Terry situation? Well, in a Terry situation, this Court has repeatedly said that in appropriate circumstances where there's concern for officer safety that handcuffs are appropriate. Right. That's what I'm saying. But what was the concern for officer safety in this context that, in your view, permitted the type of restraint that was used? I don't believe we need to reach that question because I believe that the pat-down was consented to openly and freely by the tenant. But if – if it needs to be reached, it was the middle of the night, it was a domestic disturbance call, which is notorious among police officers as being – as holding potential for explosive violence and unpredictable behavior. The defendant's girlfriend had told him that he was a drug dealer and that he was on his way out to deal drugs. But no mention of weapons. There was specifically a question. No, there was no mention of – no specific mention of weapons. But I don't think it's unreasonable for police, and in that situation, dealing with a suspected drug dealer to be concerned that there might well be weapons in the vicinity, a concern which was, in fact, borne out when the two guns were found in the car. But not on the person. On the Terry stop is concerned with weapons within the immediate reach of the person being patted down. That's correct. And that's – and that is exactly what this police officer was doing, patting down this individual to ensure that there were no weapons on – on his person. So then he gets the canister out. And what you're saying, it's still part of the weapon search when he feels some – feels the canister? Yes. When he – when he felt a hard cylindrical object that he could not identify by touch, he took it out of the pocket to see what it was. Again, there – of course, precedents uphold the ability of an officer to ensure that an unknown object, which might be a weapon, can be inspected further. Once he removed it from the pocket, then he knew it was not a weapon. I concede that. Then he asks a perfectly reasonable question. Is there anything in this I should know about? Okay. What was the purpose of that question? If we assume that the officer at that point knew that it was not a weapon, are you assuming that – that the officer knew the film canister was not a weapon? The officer did testify that he did have some concern that it might be full of powder, which might explode out when he – if he opened it. The testimony doesn't support the concern that there might have been a razor blade hidden in the – in the cylinder. But I think that the – the logical and probably accurate presumption is that at that point, he wanted to know what was in it because he had – was faced with someone who had been accused of being a drug dealer. Crack cocaine is routinely transported on the person in these little plastic containers. So you agree at that point he's looking for drugs as opposed to weapons? At that point, he's wondering what's inside the cylinder. I know, but was that part of the Terry stop, or where are we now in terms of procedurally? Is that still part of the Terry stop? Now, I believe we're – we're in a Terry stop, and the officer is making a reasonable inquiry to ascertain the facts, to determine whether or not – But what's the purpose of a Terry stop, though? The purpose of a Terry stop is – is to briefly detain and question an individual – this full encounter took less than five minutes – to disperse suspicion or to determine whether there's – there is a reason to arrest that individual. And questions can be asked in the course of a Terry stop. What are you doing? What's going on here? Wait. What's – what's – what is this in your pocket? Those – those questions can be asked. That's not interrogation because the individual is not at that point in custody. Was he still being restrained at that point? It was in the middle of the – of the pat-down. He was not being restrained. I do not believe he was. I thought the pat-down was over at that point. No, it was not. He had patted down one side of his body at that point and found the canister, pulled it out, and asked him what it was. Still got hold of his thumbs. That's right. He was – he had not completed the pat-down search. Okay. The second question, as – as we've been discussing, is whether or not the pat-down and the discovery of the cocaine in the canister was appropriate. The third question was not touched on at oral argument. And unless the Court has questions about it, it's whether or not the statements of the defendant when he was being transported to booking that, I only deal drugs because of her, initially, and then after being told that he was going to be booked and a search warrant was going to be obtained, volunteered the fact that there was a gun and additional drugs and a black cooler in the back of his truck. The district court found that those were volunteer statements, that they were not in response to interrogation, and therefore, the Miranda was not violated. If we disagreed with you and decided Miranda was violated, what difference does it make if you can introduce the gun and the drugs anyway? It makes no difference with respect to the first question, back at the time that he was being patted down, when he told them that there was a gun in the truck, because that was physical evidence discovered and the government did not appeal the district court's conclusion that his statement that there was a gun in the truck was taken in violation of Miranda and should be suppressed. With respect to the second question, that was evidence that the judge ruled would be admissible, his concession, I deal drugs because of her, and his statement that there were additional guns and drugs in the car showing knowledge and possession of those drugs was, I think, a factor in his guilty plea. So he probably would have to be remanded if you concluded that those statements were not properly admitted. I have only a moment. I would like just to state that very recently you also got a 28-J letter from defense counsel in this case purporting to raise Booker as a potential issue in this case. I would like to suggest that this Court does not have jurisdiction over that because the court, the defendant's notice of appeal was as to conviction only. It did not purport to appeal the sentence as well. And no issues with respect to sentencing were briefed in any way. Thank you. Roberts. Very well. Mr. Berger, you get the last word. Thank you, Your Honor. And I just wanted to, I guess, follow up on some of the questions Judge Rolison asked, because I think it's troubling in this case that a lot of the justification for this search and confrontation with Mr. Lincoln was based on consent. And I think it's clear that Mr. Lincoln was restrained by his thumbs and by the position of the officers, and that a reasonable person would not be.  of the officers, and that a reasonable person would not be. Do you find that the magistrate judge's ruling was clearly erroneous in order to grant you the review that you're asking for? Because he did make a specific finding that he consented to the pat-down. Well, no, I think it's a noble review on this issue by this Court. And looking at the totality of the circumstances, I think this Court had a mixed law and fact question. In other words, we'd have to find first that the factual determination was clearly erroneous, and then, in light of that erroneous factual determination, that the legal determination that the judge afforded those facts was his reversible error. Well, I think that is an erroneous finding of fact that Mr. Lincoln consented to this, yes. So you are claiming clear error here on the part of the factual determination. But, no, I think that beyond that, though, I think this Court can do a noble review on this consent issue. Go ahead. Let me ask you this. Was there a finding that he consented to the pat-down and or the restraint or the pat-down but not the restraint? That's where I'm having some difficulty in my mind, because I can see consenting to a pat-down but not consenting to being restrained during that pat-down. So was that delineation made during the ---- No, I don't think so. I think that Judge Beislein didn't really make that distinction. And I think that's an important distinction, because if Mr. Lincoln had consented to, and I would say it's more compliance than consent, but if he had consented to a search for weapons, this went way beyond any consent that could be implied from his activity there. So I think, and I don't think Judge Beislein made that distinction. So I think that it's beyond this search and what followed is beyond any type of consent that's in the record from Mr. Lincoln. Opposing counsel made the point that during a Terry stop, questions can be asked. What's your response to that? Well, I think that obviously officers can answer questions, but I think that it's obvious that these officers had the only information, they had nothing about violence or weapons. They had information that he might be a drug dealer. They were looking for drugs when they had that canister. When they went into Mr. Lincoln's pocket, they were looking for drugs. And the problem with this case is that if this holding allows the officers to do this under these circumstances, it really diminishes Terry, which has been the law of this land for decades. And I think under these circumstances, it's in. Well, but the Terry has always recognized that officers are entitled, if they come upon a hard object, to satisfy themselves that it's not a weapon. So would you concede that they were at least permitted to remove the hard object from his pocket in order to determine what it was? At that point, they now see a film canister. And the question goes back to what Judge Rawlinson asked. Are they then permitted as part of their Terry interrogation? And that is the wrong word, but Terry questioning to say, am I going to find something in here that might be harmful? I think that is a Terry interrogation. I think it is a proper term. I think that that goes beyond the rationale of Terry is to police officer protection and for safety of officers in search for weapons. I seem to be the only one in the courtroom who is concerned about officers getting AIDS from being pricked by dirty needles. I mean, it is not unheard of. No, I know. There is a real serious problem for officers on the street. And there is a lot of potential risk in any kind of a situation with law enforcement. I think everybody recognizes that. But I think that there has to be reasonable parameters. But isn't this one of those areas where the Supreme Court tells us time and again, this is the classic, you judges can take months to decide what an officer who is concerned at 1 o'clock in the morning for his safety has to make a split-second decision on? Am I dealing with somebody who might pose a potential danger to me or others or not? No, I think this is a case where police officers obviously had a report of a drug dealer and they were going to go do a shakedown of somebody for drugs and without meeting the standards that this court is up to uphold. That's why we rely on this court and the courts to uphold these Fourth Amendments. And maybe it is in retrospect, but that's our duty is to make sure that the Fourth Amendment survives, even if the police officers step over a boundary in their drug investigation. Thank you, Mr. Cronin. I appreciate the arguments on both sides. The case just argued is submitted. The next two cases.
judges: Canby, Tallman, Rawlinson